Eastern District of Kentucky
F I L E D

NOV 1 4 2022

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

Luke Reed

# PROGRESS NOTES

| | 4/7/1988 | | | | |
|---|---|---|---|---|---|
| 9/2/22 | BP-124/78  P-68    T-97.8  Spo2-98  Wt-154.5  Ht- 6'0 | | | | |
| | Want to get blood work and things done. Itching of | | | | |
| | rectum. Only at night time. ——————————— AJCRN | | | | |
| | 34 y/o WM lost a lot of wt going through divorce .. ↓50 lbs. | | | | |
| | rec fruit + veg. Strong FHx DM .  ? ccould be. | | | | |
| | c̄ urinary freq. c̄ vision prob. c̄ blurred vision. | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | 124/78   68   97.8   98% | |
| | | | | Wt 154.5   Ht 6.0 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | Δ/p Farms. | | | | |
| | Rec wt gain | | | | |
| | ? Pin worms · Mebendazole 100mg x1 | | | | |
| | may repeat x1 in | | | | |
| | 3wks. | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Lucky " L" Davison Reed
930 mount zion road
Springfield KY 40069


Paperwork in Response to Case 5:22: 270, Information provided with
documentation. Information for Honorable Judge Caldwell.


11-13-2022                                                    L.D.R

**III.    Statement of Claim**

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

**IV.    Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

**V.    Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.    For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  _11-13-22_

11-13-22  2.R

Fill out the paragraphs in this section that apply to this case.

**A.     If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

38 U.S. Code § 7316, 22 U.S. Code § 2702, 38 U.S Code § 7332 "Hippa"

**B.     If the Basis for Jurisdiction Is Diversity of Citizenship**

1.     The Plaintiff(s)

   a.     If the plaintiff is an individual
   The plaintiff, *(name)* _____ , is a citizen of the
   State of *(name)* _____ .

   b.     If the plaintiff is a corporation
   The plaintiff, *(name)* _____ , is incorporated
   under the laws of the State of *(name)* _____ ,
   and has its principal place of business in the State of *(name)*
   _____ .

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

   a.     If the defendant is an individual
   The defendant, *(name)* _____ , is a citizen of
   the State of *(name)* _____ . Or is a citizen of
   *(foreign nation)* _____ .

   b.     If the defendant is a corporation
   The defendant, *(name)* _____ , is incorporated under
   the laws of the State of *(name)* _____ , and has its
   principal place of business in the State of *(name)* _____ .
   Or is incorporated under the laws of *(foreign nation)* _____ ,
   and has its principal place of business in *(name)* _____ .

   *(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.     The Amount in Controversy

   The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

   $1,000,000

# L & N Solutions
*Where the old meets the new*

## Business Plan

## Executive summary

L & N Solutions LLC, owned by Luke Reed, is a business focused on creating modern-day bourbon products from ones established in the early prohibition era.   Luke's mission is to restore the authentic brands of his ancestors and bourbon forefathers by mixing the old with the new to create the perfect cocktail of products.  His goal is to create quality products that will exist for generations to come.

The products will be branded and developed to resemble historical products from a material aspect and a liquid stand point.   It is anticipated that the products will be promoted through traditional distribution networks and by meeting with other companies to sell and promote the idea.  Utilizing digital technology, L & N Solutions will offer secure and convenient ways for a company to review requested products to determine their interest in purchasing.

The first project is centered around the "Atherton" brand.  We will work with a local distillery after the project is completed to start distilling for the following year on this product. Approximately 20,000 proof gallons will need to be distilled for allocation in 2024-2025. This would all go towards the "Atherton brand".

Luke is the sole owner of the company and any processes are directly managed by him.  The regulations of what the business has to go through have been created.    The business is structured as a LLC and future products have all been trademarked through governmental agencies.

## Market Analysis

### Key Trends
- Industry profit has been slightly volatile
- Small whiskey distilleries are proliferating rapidly across the country
- The industry's growing popularity has benefited the US market for whiskey
- Continual increases in the popularity of whiskey are expected to continue attracting new distilleries
- As competition heightens over the next five years, operators of all sizes are anticipated to introduce products tailored to specific niches to capture additional market share
- International consumers are expected to release pent-up demand, following the coronavirus pandemic, resulting in steady export gains over the next five years
- Excise tax on distilled spirits is projected to decrease, boosting industry revenue

Although the US economy has largely benefited from sales of the industry's most dominant companies and most popular brands, emerging craft spirits companies have expanded in

1

regions never before associated with whiskey production. As a result, over the five years to 2020, the number of industry operators is expected to increase at a staggering annualized rate of 13.2% to 616 operators, while employment is expected to rise an annualized 12.7% to 4,294 workers.   IBIS*World* Industry Report – Whiskey & Bourbon Distilleries, Sep 2020.

Craft distilleries quickly captured a growing share of the market, resulting in consistent declines in market share concentration, as younger consumers displayed their penchant for niche producers. However, smaller operators are expected to experience harsher operating conditions in 2020, amid the coronavirus pandemic, as they generally rely on in-house bars and tasting rooms, which have largely been prohibited from operating at full capacity.  Moreover, smaller operators tend to have a slighter range of downstream markets, resulting in greater losses as they are unable to pivot in the manner larger operators are able.  IBIS*World* Industry Report – Whiskey & Bourbon Distilleries, Sep 2020.

While the future regarding the COVID-19 (coronavirus) pandemic remains shrouded in uncertainty, IBISWorld projects the economy will begin to recover in 2021, as consumers return to work and the pandemic subsides. As a result, per capita disposable income is expected to return to growth, resulting in more consumers opting for higher priced brands, boosting growth. IBIS*World* Industry Report – Whiskey & Bourbon Distilleries, Sep 2020.

The current growth in the market is estimated to be around 6 percent in 2021-2025. This is a steady growth and also gives a small brand the opportunity to establish itself in the market. Growth in the bourbon market has seen superb heights since 2016. According to the Csmarket report, Constellation brands cash flow margin grew approximately 2.00% and gross profit was ~ 51%.  Diageo brands grew ~ 3.83% cash flow.  Although these are larger companies, it shows the large opportunity for growth and expansion in the market.   Limestone branch distillery in 2019-2021 had some of the same outcomes as the larger market. They produce a product called "Yellowstone" which has shown exceptional growth of almost 50% from 2018 - 2021.

**Products**

The first project is centered around the "Atherton" brand.  We will work with a local distillery after the project is completed to start distilling for the following year on this product. Approximately 20,000 proof gallons of Atherton Bourbon will need to be distilled for allocation in 2024-2025

This would possibly consist of using approximately 600-700 runs off a 1,000-gallon cooking vat to produce this many proof gallons.  Each run will use approximately 33-35 bushels per run. This would cost approximately $30,000 to $50,000 for corn since it is a non-hybrid variety (non GMO).   This price also reflects proper storage costs and hauling expenses once distillation starts.   It does not reflect the electrical cost of operating a fan that ensures the moisture count stays consistent.

The additional grains that will be included (rye, malt, wheat) will be an additional $20,000 for this product. The upfront cost is $12.00 per proof gallon being distilled. The cost of the yeast would be approximately $1000 dollars for the entire year of production.  Considering every distilling run, at least half the yeast will die off and if the distillery propagates it before usage then we will save capital at the end of the year.

Considering we have approximately 500 barrels also being stored and aged in another distillery warehouse will also cost us approximately $2.75 per barrel for state tax. This would be an

2

additional $2750 that will need to be paid upfront every year, unless the tax fluctuated.  At a minimum these barrels will be aged for four years which will cost $11,000 upfront for the barrels to be aged.

**Marketing strategy**

Focusing the products toward the premium brands will be the task. Expanding the information and resources for the public to learn more about the brand using the oscar Getz museum. Teaming up with the kentucky distillers association so that we can get a focus group to break down the barriers of what exactly we need to expand this in the future. Collaborating with the Independent Stave company so that we can have blind  tasting to ensure the product will be to standard for the industry. We will introduce a rough product the label company to see about expanding the PR relations to outside resources. This will not limit us solely in the United States but will ensure that our product has solid backing.

**Management and Operations Plan**

All production will be handled by a third-party contractor who will provide bottling, labeling, filling, and distribution.  The external component of the branded items will be contracted through a graphic design company who will facilitate the creation of new labelling and marketing materials.   Planning and scheduling, managed by the owner, will go hand in hand with third-party distribution companies.  The first project will be available on a very limited basis.

**Financial Data**

Projections are based on first project – Atherton.

**Appendix**

3

## §7316. Malpractice and negligence suits: defense by United States

(a)(1) The remedy-

(A) against the United States provided by sections 1346(b) and 2672 of title 28, or

(B) through proceedings for compensation or other benefits from the United States as provided by any other law, where the availability of such benefits precludes a remedy under section 1346(b) or 2672 of title 28,

for damages for personal injury, including death, allegedly arising from malpractice or negligence of a health care employee of the Administration in furnishing health care or treatment while in the exercise of that employee's duties in or for the Administration shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the health care employee (or employee's estate) whose act or omission gave rise to such claim.

(2) For purposes of paragraph (1), the term "health care employee of the Administration" means a physician, dentist, podiatrist, chiropractor, optometrist, nurse, physician assistant, expanded-function dental auxiliary, pharmacist, or paramedical (such as medical and dental technicians, nursing assistants, and therapists), or other supporting personnel.

(b) The Attorney General shall defend any civil action or proceeding brought in any court against any person referred to in subsection (a) (or such person's estate) for any such damage or injury. Any such person against whom such civil action or proceeding is brought shall deliver within such time after date of service or knowledge of service as determined by the Attorney General, all process served upon such person or an attested true copy thereof to such person's immediate superior or to whomever was designated by the Secretary to receive such papers and such person shall promptly furnish copies of the pleading and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the Secretary.

(c) Upon a certification by the Attorney General that the defendant was acting in the scope of such person's employment in or for the Administration at the time of the incident out of which the suit arose, any such civil action or proceeding commenced in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States of the district and division embracing the place wherein it is pending and the proceeding deemed a tort action brought against the United States under the provisions of title 28 and all references thereto. After removal the United States shall have available all defenses to which it would have been entitled if the action had originally been commenced against the United States. Should a United States district court determine on a hearing on a motion to remand held before a trial on the merits that the employee whose act or omission gave rise to the suit was not acting within the scope of such person's office or employment, the case shall be remanded to the State court.

(d) The Attorney General may compromise or settle any claim asserted in such civil action or proceeding in the manner provided in section 2677 of title 28, and with the same effect.

(e) The Secretary may, to the extent the Secretary considers appropriate, hold harmless or provide liability insurance for any person to whom the immunity provisions of this section apply (as described in subsection (a)), for damage for personal injury or death, or for property damage, negligently caused by such person while furnishing medical care or treatment (including the conduct of clinical studies or investigations) in the exercise of such person's duties in or for the Administration, if such person is assigned to a foreign country, detailed to State or political division thereof, or is acting under any other circumstances which

would preclude the remedies of an injured third person against the United States, provided by sections 1346(b) and 2672 of title 28, for such damage or injury.

(f) The exception provided in section 2680(h) of title 28 shall not apply to any claim arising out of a negligent or wrongful act or omission of any person described in subsection (a) in furnishing medical care or treatment (including medical care or treatment furnished in the course of a clinical study or investigation) while in the exercise of such person's duties in or for the Administration.

.........

## §7316. Malpractice and negligence suits: defense by United States

(a)(1) The remedy-

(A) against the United States provided by sections 1346(b) and 2672 of title 28, or

(B) through proceedings for compensation or other benefits from the United States as provided by any other law, where the availability of such benefits precludes a remedy under section 1346(b) or 2672 of title 28,

for damages for personal injury, including death, allegedly arising from malpractice or negligence of a health care employee of the Administration in furnishing health care or treatment while in the exercise of that employee's duties in or for the Administration shall be exclusive of any other civil action or proceeding by reason of the same subject matter against the health care employee (or employee's estate) whose act or omission gave rise to such claim.

(2) For purposes of paragraph (1), the term "health care employee of the Administration" means a physician, dentist, podiatrist, chiropractor, optometrist, nurse, physician assistant, expanded-function dental auxiliary, pharmacist, or paramedical (such as medical and dental technicians, nursing assistants, and therapists), or other supporting personnel.

(b) The Attorney General shall defend any civil action or proceeding brought in any court against any person referred to in subsection (a) (or such person's estate) for any such damage or injury. Any such person against whom such civil action or proceeding is brought shall deliver within such time after date of service or knowledge of service as determined by the Attorney General, all process served upon such person or an attested true copy thereof to such person's immediate superior or to whomever was designated by the Secretary to receive such papers and such person shall promptly furnish copies of the pleading and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the Secretary.

(c) Upon a certification by the Attorney General that the defendant was acting in the scope of such person's employment in or for the Administration at the time of the incident out of which the suit arose, any such civil action or proceeding commenced in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States of the district and division embracing the place wherein it is pending and the proceeding deemed a tort action brought against the United States under the provisions of title 28 and all references thereto. After removal the United States shall have available all defenses to which it would have been entitled if the action had originally been commenced against the United States. Should a United States district court determine on a hearing on a motion to remand held before a trial on the merits that the employee whose act or omission gave rise to the suit was not acting within the scope of such person's office or employment, the case shall be remanded to the State court.

(d) The Attorney General may compromise or settle any claim asserted in such civil action or proceeding in the manner provided in section 2677 of title 28, and with the same effect.

(e) The Secretary may, to the extent the Secretary considers appropriate, hold harmless or provide liability insurance for any person to whom the immunity provisions of this section apply (as described in subsection (a)), for damage for personal injury or death, or for property damage, negligently caused by such person while furnishing medical care or treatment (including the conduct of clinical studies or investigations) in the exercise of such person's duties in or for the Administration, if such person is assigned to a foreign country, detailed to State or political division thereof, or is acting under any other circumstances which

would preclude the remedies of an injured third person against the United States, provided by sections 1346(b) and 2672 of title 28, for such damage or injury.

(f) The exception provided in section 2680(h) of title 28 shall not apply to any claim arising out of a negligent or wrongful act or omission of any person described in subsection (a) in furnishing medical care or treatment (including medical care or treatment furnished in the course of a clinical study or investigation) while in the exercise of such person's duties in or for the Administration.

## 38 U.S. Code § 8153 - Sharing of health-care resources

a)
(1)
To secure health-care resources which otherwise might not be feasibly available, or to effectively utilize certain other health-care resources, the Secretary may, when the Secretary determines it to be in the best interest of the prevailing standards of the Department medical care program, make arrangements, by contract or other form of agreement for the mutual use, or exchange of use, of health-care resources between Department health-care facilities and any health-care provider, or other entity or individual.
(2)
The Secretary may enter into a contract or other agreement under paragraph (1) if such resources are not, or would not be, used to their maximum effective capacity.
(3)
(A)
If the health-care resource required is a commercial service, the use of medical equipment or space, or research, and is to be acquired from an institution affiliated with the Department in accordance with section 7302 of this title, including medical practice groups and other entities associated with affiliated institutions, blood banks, organ banks, or research centers, the Secretary may make arrangements for acquisition of the resource without regard to any law or regulation (including any Executive order, circular, or other administrative policy) that would otherwise require the use of competitive procedures for acquiring the resource.

To whom it may concern:

Luke Davison Reed (DOB 4/7/1988) is currently under my care for psychiatric symptoms. The last time he was seen was 01/31/2020. He has been seen 2 other times in the office: 12/06/2019 & 10/24/2019.

He reports taking his medications as prescribed. Currently, his level of risk to harm self or others is determined to be low. In each case where he has been evaluated in the office his risk level is determined to be low.

Sincerely,

Dr. Jenna Buchanan APRN, DNP, PMHP-NP

following my visitation with Dr. Reiser, a clinical physician that works at "The Ridge" in Kentucky. He concluded after several sessions with me that I had a mild case of "OCD" Compulsive Disorder. following Dr. Reiser conclusion & advice I then followed up with a local proctor in Washington Co, to ensure they were happy I was listening to them "Tim Ash", & Bill Robinson. The following dates I then started going to Beechwood "Lifetime" since my Wife had recommended this & the additional jobs in Town. My Business didn't help the situation, however I complied with Lifetime & due to that I loss my Business & my wife. My home is now tied in court & vehicle. The way they pre-scribed me affected my entire life & that is why im suing for the amount provided. Thank you

Procedures/Tests Performed During Hospitalization: ☑ Lab  ☐ x-ray ☐ EKG  ☐ Other:
Summary of Results: ☑ No significant findings  ☐ See attached results

Are there any results (lab, x-ray, etc.) pending at discharge? ☑ No ☐ Yes _____

If **YES**, contact Medical Records at **859-268-6415** Monday thru Friday 8am to 4pm to obtain results of any pending tests

Follow up with your primary care physician:
☑ At a minimum of yearly, for an exam and/or as physician recommends for chronic health conditions.
☐ Referral for evaluation of sleep apnea
☐ To get the following lab work done: _____
☐ Other: _____

DIET:   ☑ Regular  ☐ Special diet _____

ACTIVITY RESTRICTIONS: ☑ None  ☐: _____

DISCHARGE MEDICATIONS:  (see attached Discharge Medication List)
☑ Return patient's home medications     ☐ Destroy patient's home medications     ☑ SSRI/Black box information to patient
☐ Release patient's home medications to _____

Antipsychotic Medication at Discharge: ☑ None ☐ 1 ☐ 2 or more     Rationale for prescribing 2 or more antipsychotic medications:
☐ Pt. failed 3 or more trials of monotherapy. List medications: 1 _____ 2 _____ 3 _____
☐ Plan to taper to monotherapy/cross-taper in progress. Medication to be tapered off: _____
☐ Augmentation of Clozapine        ☐ Other: _____

## DISCHARGE DIAGNOSES

Psychiatric:  OCD

Medical:  None

## PRE-DISCHARGE RISK ASSESSMENT

| Current Status | Informants: ☑ Patient  ☐ Family/Guardian ☐ Other: |
|---|---|
| Suicidal ideation/threats  ☐ Yes ☑ No | History of suicide attempts soon after discharge: ☐ Yes ☑ No |
| Homicidal ideation/threats ☐ Yes ☑ No | History of concealing or denying past suicide/homicide/assault ideation or behaviors? ☐ Yes ☑ No |

Comments:

PHYSICIAN Signature: _____  Date 7/21/19 Time 8P

Print Name: _____ Rieser

Telephone order received from/by: _____  Date____ Time____

Nurse Signature: _Micabrewch_  Date 7/22/19 Time 1015

I am currently treating Luke Reed for his condition. He is taking medications as prescribed, attending appointments and is compliant with care.

Sincerely,

Dr. Jenna Brehaar DNP APRN

Historian and Past Medical Records:

Independent Test Interpretation:

Assessments:
GAD-7 = 10
PHQ-9 =

**Assessment and Plan**
Assessment and Functional Status: poor historian, not as guarded as last time, not compliant with meds, declines to take prescribed dose
Goals and Plan:
Medication:
     per his insistence, continue luvox; prescribed 100mg by mouth bid, taking 50mg qd. Unclear how much he is drinking, vague symptoms

Explained why xanax is not an option

return to clinic 2 months

Adjunct Treatment:
Collaborate with:

Lifestyle/Behavior Modification:
If symptoms do not improve or recur, consider:
Follow up In:

Patient Instruction/Education Provided:

Patient was provided with instructions regarding diagnosis and recommendations. Questions were welcomed and answered.

**Diagnoses**
F42.2 MIXED OBSESSIONAL THOUGHTS AND ACTS

Present at Session:  Patient.

Telehealth visit, informed consent obtained and patient location verified.

Electronically Signed:  VINCENT MULLEN MD on/at 4/5/2021 2:33:52 PM

Data Collected Outside of Interview: KASPER reviewed
Assessment: F31.9 BIPOLAR DISORDER UNSPECIFIED
Status: Improving

F42.2 MIXED OBSESSIONAL THOUGHTS AND ACTS
Status: Improving

*Dictate*

P: discontinued Zyprexa as Patient did not take it. Maintain Abilify 10 mg at hs as patient is improving on this.
Still recommend mood stabilizer for future prevention of manic episodes, but Patient does not want to add
anything at this time. Wife and Patient requested a plan if Patient seems to be slipping into a manic episode
again; discussed warning signs and plan of increasing abilify/adding lithium; going to ER if symptoms are
severe.

follow up next week
Plan: Visit Summary
Prescriptions:
SIG: aripiprazole 10 mg oral tablet, 30 days, Dispense #30 Tablet, 0 Refills
Directions: Take 1 oral tablet once a day

Risks and Benefits of Prescribed Medication: Reviewed the risks, benefits, target symptoms and side effects of
all the patient's psychotropic medications prescribed today with patient. Psychoeducation regarding diagnosis.
Psychoeducation regarding treatment plan. Questions were welcomed and answered.

I reviewed the rationale for and risks and benefits of the recommended treatment with the patient or legal
guardian who expressed an understanding of, and agreed with, the recommendations.

Informed consent for telehealth obtained and patient location verified.

Psychotherapy Type: supportive
Psychotherapy Time: 60
Psychotherapy Description: Supportive psychotherapy provided to Patient and wife; answered questions
regarding treatment and gave encouragement regarding reasoning for continued medication. Patient and wife
had goal of formulating plan if future manic episodes occur and this was discussed in depth with them.

Interactive Complexity: Managed maladaptive communication (related to e.g., high anxiety, high reactivity,
repeated questions, or disagreement) among participants that complicated delivery of care.
Complex communication factor were present during this visit, including: Patient requesting that both he and his
wife be present at different locations via telehealth, but also required appointment time before and after wife
entered appointment

**Diagnoses**

Past Psychiatric Medications: >>Current Psych Meds:
-Aripiprazole 10 mg by mouth qd

>>Current Medical Meds:
-None

>>Side effects to current psychiatric medications: None noted; night sweats resolved

>>Past Meds/Response/Rxn: Sertraline; Prozac (swelling in ankles)
Allergies/Adverse Reactions: NKDA

**Review of Systems:**
ROS performed on a previous encounter was reviewed with the patient: See HPI.
Psychiatric Symptoms:
ROS Summary: PSYCHIATRIC ROS:
>>Depressive Symptoms: improving;
>>Mania/Hypomania: no current symptoms
>>Sleep: Continued difficulty sleeping, improving from last visit
>>Appetite: No reported issues
>>Substance Use: Not assessed today; Previously-- chewed tobacco daily; ETOH liquor, decreased to "about
one shot every other day" down from a pint per day; No cannabis or street drug use;
>>Psychosis: Delusions; Paranoid features; Ideas of Reference;---all improving, much clearer thought process
today.

MEDICAL ROS: No headaches; No reported weakness; No falls;
>>Constitutional/Pain/Fatigue: See vital signs (if applicable); Appropriate dress, appears stated age No pain;
No reported fatigue;
>>Neuromuscular: No abnormal muscle movements;
>>All remaining medical systems listed below under "Review of Systems" in this document have been
reviewed and were negative for complaint.
Currently Pregnant: _X_N/A; ___ "no"
PMH: No surgeries

**Medical Review of Systems**
All systems not detailed below have been reviewed and are negative.
Respiratory: no wheezing or SOA.
Gastrointestinal: no n/v/d.
Musculoskeletal: no abnormal muscle movements.
Neurological: no seizures or head injuries.

**Past Medical, Psychiatric, Family and Social History**
No changes to PFSH since previous visit.
PFSH Summary: PFSH [Updated/New 3/25/20]:

expecting a baby in 3-4 weeks, so we will follow up in 2 weeks per the patient's request.

Schedule therapy with Laura Brown.
Plan: continue current POC
Risks and Benefits of Prescribed Medication: Reviewed the risks, benefits, target symptoms and side effects of all the patient's psychotropic medications prescribed today with patient. Psychoeducation regarding diagnosis. Psychoeducation regarding treatment plan. Questions were welcomed and answered.

I reviewed the rationale for and risks and benefits of the recommended treatment with the patient or legal guardian who expressed an understanding of, and agreed with, the recommendations.

Informed consent for telehealth obtained and patient location verified.

Psychotherapy Type: supportive
Psychotherapy Time: 16
Psychotherapy Description: Spent 20 mins in supportive therapy with Patient and wife, addressing concerns and formulating a plan of care. Wife requested to review more warning signs of impending mania, so we discussed this as well. Discussed importance of continued marital counseling as well as for patient to pursue counseling on his own.

**Diagnoses**
F31.9 BIPOLAR DISORDER UNSPECIFIED
 F42.2 MIXED OBSESSIONAL THOUGHTS AND ACTS


Electronically Signed:  LAUREN WILSON PMHNP-BC on/at 5/7/2020 10:58:14 AM

P: Recommend Lithium + antipsychotic; decreased ethanol/alcohol consumption. Discussed inpatient treatment w/ patient, however he is adamantly opposed to this. He will call me back tomorrow and let me know if he decides to take lithium. He did agree to continue taking his antipsychotic, but he wants to switch back to zyprexa as we discussed last week.

Plan: lithium +zyprexa
decrease ethanol/alcohol

follow up 2 weeks
Risks and Benefits of Prescribed Medication: Reviewed the risks, benefits, target symptoms and side effects of all the patient's psychotropic medications prescribed today with patient. Psychoeducation regarding diagnosis. Psychoeducation regarding treatment plan. Questions were welcomed and answered.

I reviewed the rationale for and risks and benefits of the recommended treatment with the patient or legal guardian who expressed an understanding of, and agreed with, the recommendations.

Informed consent for telehealth obtained and patient location verified.

Psychotherapy Type: supportive
Psychotherapy Time: 75
Psychotherapy Description: Spent extended amount of time in supportive therapy with Patient and wife; discussed events leading up to current state and what needs to happen before he can go back home. Goal is to improve patient insight into need for medication so that he can become treatment adherent. Also gave education regarding how with each manic or psychotic episode, return to baseline is less likely.

Diagnoses
F31.9 BIPOLAR DISORDER UNSPECIFIED
F42.2 MIXED OBSESSIONAL THOUGHTS AND ACTS

Electronically Signed:  LAUREN WILSON PMHNP-BC on/at 4/23/2020 7:16:43 PM

ROS Summary: PSYCHIATRIC ROS:
>>Depressive Symptoms: Worsening, severe on average over the past 2 weeks with symptoms of depressed mood, difficulty concentrating;
>>Mania/Hypomania: Rule out manic behaviors vs ongoing psychosis (ie schizophrenia);
>>Sleep: Continued difficulty sleeping
>>Appetite: No reported issues
>>Substance Use: Not assessed today; Previously-- chewed tobacco daily; ETOH liquor, 1 pint for the past month; No cannabis or street drug use;
>>Psychosis: Delusions; Paranoid features; Ideas of Reference;

MEDICAL ROS: No headaches; No reported weakness; No falls;
>>Constitutional/Pain/Fatigue: See vital signs (if applicable); Appropriate dress, appears stated age No pain; No reported fatigue;
>>Neuromuscular: No abnormal muscle movements;
>>All remaining medical systems listed below under "Review of Systems" in this document have been reviewed and were negative for complaint.
Currently Pregnant: _X_N/A; ___ "no"
PMH: No surgeries

**Medical Review of Systems**
All systems not detailed below have been reviewed and are negative.

**Past Medical, Psychiatric, Family and Social History**
No changes to PFSH since previous visit.
PFSH Summary: PFSH [Updated/New 3/25/20]:
>>New psychiatric or medical history uncovered/disclosed:
--No recent illnesses or doctor's visits; No new medications per patient

PFSH [Previous Note 1/31/20]:
>>New psychiatric or medical history uncovered/disclosed:
--Recent visit to the Ridge for Outpatient therapy program, 2 weeks;
Smoking Status: Current Light Tobacco Smoker
Vaping: No.

**Pain Assessment**
No.
Emotional or Physical Pain:

**Mental Status Exam**
Vitals: Height: 71 inches.

MSE Summary: UTA blood pressure and heart rate during appt as patient did not have access to cuff. Patient educated to obtain these for all future telehealth appts.

Judgment and Insight: Judgement for social situations and everyday activities within normal limits.  Good insight regarding reason for visit.
Orientation: Alert and oriented to person, place, time and situation.
Memory: Recent and remote intact.
Attention: WNL, Not impaired.
Language: Names objects appropriately, demonstrates understanding.
Fund of Knowledge: Intact for current events, past history and vocabulary.
Mood and Affect: irritable, anxious

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: Patient denies.
Risk Factors: Access to Firearms: "Yes"
Hopelessness about the present or future: "No"
Passive/Active SI: Patient denies
Passive/Active HI: Patient denies
Previous attempts: None, per patient report
Status: The patient's current risk level to self and others is determined to be: LOW
Plan to Address Risk Factors: Call suicide hotline, 911 or go to the nearest E.D. if having active suicidality.
Protective Factors: At least one loving relationship, Family support

**Medical Decision-Making**
Data Collected Outside of Interview: KASPER reviewed
Assessment: F31.9 BIPOLAR DISORDER UNSPECIFIED
Status: Worsening
Plan:
DC Abilify 10 mg; cut in half for two days, stop then restart Zyprexa 5 mg. Risks and benefits reviewed with patient

F42.2 MIXED OBSESSIONAL THOUGHTS AND ACTS
Status: Worsening
Plan: Maintain--
Fluvoxamine 100mg po BID (pt not taking consistently);

follow up 1 week
Plan: Visit Summary
Prescriptions:
SIG: olanzapine 5 mg oral tablet, 30 days, Dispense #30 Tablet, 0 Refills
Directions: Take 1 oral tablet at bedtime
Risks and Benefits of Prescribed Medication: Reviewed the risks, benefits, target symptoms and side effects of all the patient's psychotropic medications prescribed today with patient. TYPICAL ANTI-PSYCHOTICS - Reviewed risks, benefits and side effects including: Drowsiness; dizziness when changing positions; blurred vision; rapid heartbeat; sensitivity to the sun; skin rashes; menstrual problem; rigidity; persistent muscle spasms; tremors; restlessness; extrapyramidal symptoms, such as tardive dyskinesia, parkinsonism; dystonia;

**Medical Review of Systems**

**Past Medical, Psychiatric, Family and Social History**
History Provided By: Self. Davison Reed

*185 pounds*
*Ended 140 lbs*

**Pain Assessment**
Current Pain: No.
Current Pain on Scale of 1 to 10: 0
Emotional or Physical Pain: Physical.

**Mental Status Exam**
Vitals: Weight: (85 pounds) Height: 71 inches. BMI: 25.8. Pulse: 66.
MSE Summary: >>Constitutional: Vital signs (see above if applicable); Pt declined blood pressure reading;
>>General Appearance: Appropriate dress, appears stated age
>>Mood and affect: "Depressed," per patient. Broad, congruent, appropriate
>>Orientation: Alert and oriented to person, place and time
>>Musculoskeletal: Normal gait and station. Muscle strength and tone: WNL; No abnormal muscle movements
>>Speech: Normal rate, volume, tone, articulation, coherence, and spontaneity
>>Thought Process: Linear/goal directed, logical, and future oriented. Normal rate
>>Associations: Non-tangential/circumstantial
>>Thought content: Denies thoughts of harm to self or others. No evidence of
preoccupation with violence or delusions. Denies AV hallucinations. Not attentive to internal stimuli
>>Judgment and insight: Good
>>Attention/concentration: intact
>>Recent and remote memory: intact
>>Language: intact, per conversation
>>Fund of Knowledge: Adequate; Average intelligence per verbal expression; able to articulate needs

**Risk/Protective Assessment**
Suicidal or Homicidal Ideation: Patient denies.
Risk Factors: Access to Firearms: "Yes"
Hopelessness about the present or future: "No"
Passive/Active SI: Patient denies
Passive/Active HI: Patient denies
Previous attempts: None, per patient report
Status: The patient's current risk level to self and others is determined to be: LOW
Plan to Address Risk Factors: Reviewed with patient today to call suicide hotline, 911 or go to the nearest E.D.
if having active suicidality.
Protective Factors: At least one loving relationship, Family support

**Medical Decision-Making**
Data Collected Outside of Interview: Check TSH reflex

Chief Complaint: Mood Dysregulation, Psychosis, and Anxiety symptoms follow up

"I'm concerned about my Husband and don't know what to do. I want to make sure you have all the background information you need to help him."

**History of Present Illness:** Patient is a 32 y/o man seen briefly by multiple providers in the last 2 years. He says he had Obsessive Compulsive Disorder  and needs to get back on luvox. He is a poor historian because he is somewhat guarded. He asks if I have to ask him all of these questions.

He says he is depressed. He denies manic/psychotic symptoms

By review of the chart he seems to have problems with alcohol.

He currently is homeless, unemployed. He is divorced with 3 kids ages 2,3,7.

He denies SI/HI.

He is vague about Obsessive Compulsive Disorder  symptoms but says he counts,checks and organizes things and luvox has helped in the past; he does not want other medications

Obtained verbal consent for telehealth during COVID-19 national crisis as patient unable to electronically sign form prior to appointment; instructed patient to log in to patient portal and sign telehealth consent form prior to next appointment.

**Medications**
Current Medications: No current medications on file
Past Psychiatric Medications: >>Current Psych Meds:
-Aripiprazole 10 mg by mouth qd

*Both Business were "Liquidated" "Solvent".*

>>Current Medical Meds:
-None

>>Side effects to current psychiatric medications: None noted; night sweats resolved

>>Past Meds/Response/Rxn: Sertraline; Prozac (swelling in ankles)
Allergies/Adverse Reactions: NKDA

**Review of Systems:**
ROS performed on a previous encounter was reviewed with the patient: See HPI.
Psychiatric Symptoms:

☐ FACILITY TRANSPORTATION   ☐ AMBULANCE   ☐ POLICE/DETENTION STAFF   ☐ BUS   ☐ TAXI
☐ OTHER:

### FOLLOW-UP APPOINTMENTS

| ·NAME/FACILITY | ADDRESS | PHONE NUMBER | FAX NUMBER | APPT DATE/TIME |
|---|---|---|---|---|
| **THERAPY PROVIDER:** Communicare Clinic Kevin Canfield, LPCC | 331 S Third Street Bardstown, KY 40004 | (502) 348-9206 | (502) 348-6485 | 07/29/19 @ 10:00 am |
| **PSYCHIATRIC PROVIDER:** Communicare Clinic Assigned after intake | | Same As Above | | Assigned after intake |
| **MEDICAL PROVIDER:** | | | | |
| **SCHOOL COUNSELOR:** **SCHOOL NAME:** | | | | |
| **OTHER:** | | | | |

### OTHER AFTERCARE SERVICES/REFERRALS

☐ AA/NA   ☐ REHAB   ☐ SUPPORT GROUP_____   ☐ SCHOOL/EDUCATION_____   ☐ RESIDENTIAL
☐ LTC (LONG TERM CARE)_____   ☐ COMMUNITY MENTAL CENTER/RESOURCES:_____
☐ STEP-UP/STEP-DOWN TO:_____   ✓ THERAPIST FOLLOW-UP   ☐ HOME HEALTH SERVICES
✓ PSYCHIATRIST MEDICATION MANAGEMENT   ☐ OTHER:_____

### PATIENT UNDERSTANDING OF DISCHARGE PLAN

**Discharge education/material provided:**   ☐ Suicide risk   ☐ Signs and symptoms of relapse
☐ Infection of:_____
☐ Other:_____   ☐ Other:_____
✓ Provided opportunities for questions   ✓ Patient/family verbalizes understanding of when/how to seek further treatment
✓ Patient/Family able to verbalize discharge instructions

**Therapist:** _N. Hart, KSW (?)_   (Signature)   **Date:** 07/22/19 / **Time:** 1015

**Tobacco Cessation Referral:** ☐ N/A   ☐ Pt Refused   ☐ Referral to Quitline made with patient   Date:_____   Time:_____

**Tobacco Cessation Medication:** ☐ N/A (under age 18, non-smoker, light smoker)   ☐ Pt Refused   ☐ See Medication List

**Copy of Suicide Prevention Handouts given?** ☐ Yes   ☐ No   ☐ N/A

I have received a copy of my discharge plan and authorize a copy of my discharge/aftercare plan, discharge medication list, lab/test results (if applicable), Advance Directives (if applicable), and safety/crisis plan to be provided to my aftercare provider listed above for the purpose of ongoing treatment.

**Patient:** _____   **Date:** 7/22/19 / **Time:** 1105

**Parent/Guardian (If Applicable):** _____   **Date:**_____ / **Time:**_____

**RN:** _____   Signature   **Date:** 7/22/19 / **Time:** 1103

## Medications to take after Discharge



| Medication | Dose | Route | Freq | Morning | Noon | Evening | Bedtime |
|---|---|---|---|---|---|---|---|
| **PSYCHOTHERAPEUTIC AGENTS** | | | | | | | |
| sertraline 50 mg TAB (Zoloft)<br>Indication: OCD,Depression | 50 mg | Oral | DAILY AT 0900 | ✓ | | | |

Keep a list of your Medications and update with any changes including non prescription products. Tell all of your physicians about changes at each visit and carry a copy with you at all times in case of an emergency situations. Always take medications according to your physicians instructions. Discard Medications that have expired.

Do NOT Scan to Pharmacy

print   '2/19 10:14

**ACCT #: 0163080**
**MR #: 000066697**
Admit Date: 7/17/19  15:55
Physician: Rieser, Michael J, MD
**DOB: 04/07/1988     AGE: 31 years    SEX: M**

**REED, LUKE**

Page 1 of 3